IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LIONEL KELLEY, | ) |
|     Plaintiff, | ) Case No. 20-cv-2881 |
| v. | ) Judge Mary M. Rowland |
| CHICAGO TRANSIT AUTHORITY, | ) Magistrate Judge Sunil R. Harjani |
|     Defendant. | ) |

**Plaintiff's Response to Defendant Chicago Transit Authority's
Memorandum in Support of Its Motion for Summary Judgment**

NOW COMES Plaintiff, LIONEL KELLEY, through his attorneys, and requests that this Court DENY Defendant Chicago Transit Authority's Motion for Summary Judgment. In support thereof, he states as follows:

Introduction

In brazen disregard of FRCP 56, N.D.IL's Local Rule 56.1, and this Court's standing order on Summary Judgment, the CTA submits to this Court its own, disputed, version of events—at times not even supported by any evidence at all. The facts are disputed; the CTA is wrong on the law; and the CTA is not entitled to summary judgment. Plaintiff requests that this Court **DENY** the motion. The trial of this cause is already set for February 20, 2024. It is time to proceed to trial.

Facts

Lionel Kelley lives with Type 1 diabetes, a condition he was diagnosed with in 1985. (Lionel Kelley's Statement of Additional Facts that Require the Denial of Summary Judgment, hereinafter referred to "SOF," ¶ 1). Kelley's pancreas does not produce insulin; so he must inject it, in conjunction with monitoring his food and activity. (Id.) Kelley became a "journeyman" electrician in 1994. (Id.) Kelley applied to the CTA to be an electrician on February 16, 2015. (Id. at ¶ 2). On

1

March 29, 2015, Kelley went to a pre-employment physical at Concentra on 1030 W. Chicago Ave., where he informed the doctor that he had diabetes and took insulin; and he was cleared to perform the electrician job at the CTA. (Id.) On April 6, 2015, the CTA hired him. (Id. at ¶ 3). Kelley worked in the CTA's "substations" maintaining rail equipment that supply electricity to the train tracks. (Id.) Kelley worked without incident for more than 3 years for the CTA. (Id. at ¶ 3-4).

On June 28, 2018, Kelley had finished his day's work and was recording what he had done in a logbook at a desk when he suffered the side effects of low blood sugar. (Id. at ¶ 4) He was found by a co-worker "conscious but dazed." (Id. at ¶ 4). An ambulance was called, and the crew gave him intravenous dextrose, and he ate some food. (Id.) Afterward, he drove himself home. (Id.) The next day, he worked his regular shift as usual. (Id.)

On July 2, 2018, Kelley was called into a meeting with his supervisor, Jeannine Messina. (Id. at ¶ 5). In this meeting, Messina learned that Kelley had diabetes for the first time; she did not know it before. (Id.) Messina removed him from service (i.e., stopped letting him report to work) "for being a Type 1 diabetic" and "being found unresponsive." (Id. at ¶ 35). She told him that "Leave Management" would contact him. (Id. at ¶ 7). The next day, Deshone Maddox (Coordinator of Leave Management) emailed various personnel at Concentra an "authorization for testing form" for Kelley. (Id.) She informed them he needed a fitness for duty exam because he had been found unresponsive. (Id.) She informed them he had diabetes; and sent them his job description. (Id.) Maddox scheduled Kelley for his Concentra appointment on July 5, 2018. (Id. at ¶ 8).

On July 5, 2018, Kelley saw a Dr. Kang at Concentra. (Id.) Dr. Kang told Kelley to get a note from his PCP "stating that you're in good condition to go back to work." (Id.) So Kelley called his doctor, Dr. Venetos. (Id.) He told Dr. Venetos what had happened and told him he needed a note to return to work. (Id.) Dr. Venetos faxed in a form on July 6, 2018 to Concentra that said Kelley was clear to return. (Id.) On July 9, 2018, Kelley called Messina (his supervisor) but she

2

emailed Maddox ("leave management") saying she thought he needed to return to Concentra first. (Id. at ¶ 9). So Maddox asked Concentra to instruct Kelley to report back to Concentra and she herself instructed Kelley to "report back to Concentra." (Id.) Concentra contacted Kelley to come back on July 13, 2018. (Id. at ¶ 10). So he did. (Id.)

On July 13, 2018, a Friday, Kelley went to Concentra and saw a Dr. Patino. (Id.) She "took his sugar" and gave him a physical. (Id.) After his appointment, at 9:11 a.m., he was given a note that said "result status: no medical restrictions" and "may RTW without restrictions as of 7/13/18." (Id.) She had a copy of his job description. (Id.) After this visit, Kelley gave the note to his foreman and also called Messina (his administrative supervisor). (Id.) Messina knew he had been cleared by Concentra. (Id.)

However, the foreman told Kelley that Messina was "not recognizing" the release. (Id. at ¶ 13) At 2:28pm that day, an employee in leave management[1] emailed Georgette Hampton (head of leave management) and Messina (Kelley's supervisor) in response to emails from them that "I spoke to Mr. Kelley and he was advised not to report to work…" (Id.) She also told him to "expect a follow up call from Leave Management on Monday." (Id.)

Monday, July 16, 2018, at 10:15 a.m., Maddox emailed Carla Lowe at Concentra. (Id. at ¶ 14). She wrote "Mr. Kelly (sic) works in a safety sensitive position and is insulin dependent. Can you call me about this case?" (Id.) Ms. Lowe is not a doctor and has no medical background; she was the office manager. (Id.)

On July 16, 2018 at 11:09 a.m., Messina (Kelley's supervisor) wrote an email to her boss, William Mooney and five other people: "All, please be advised Mr. Kelley has been found unfit to return to work and should be carried as sick on the time sheets. If you should have any questions, please let me know." (Id. at ¶ 15). (Id.) Messina did not say that his status was "pending further

---

[1] Maddox was on vacation. (SOF at ¶ 13)

medical review," or that further investigation was required, or that *anything* remained in limbo. (Id.) At this point, <u>no doctor had found Kelley unfit to work</u>. (Id.) The only inference that makes sense is that Messina was using the passive voice about *a decision she had made*. Messina's statement that Kelley "should be carried as sick on the time sheets" shows that <u>she</u> had the power to control whether Kelley returned to work or not. (Id.)

At 11:34 a.m. (on July 16, 2018), Carla Lowe wrote in an email to Dr. Patino: "Can you please update [Kelley's] physical to reflect he is not qualified to RTW?" (Id. at ¶ 16). She also wrote "I have already reached out to the patient to inform him of the updated status." (Id.) No medical professional had said Kelley was "not qualified to [return to work]." (Id. at ¶ 15). Nonetheless, Lowe had already told Kelley of the "updated status." (Id. at ¶ 16). Lowe did not ask Patino to see him again. She did not ask a different doctor to see him. She did not mention anything that Kelley could or should do. No, she wrote that it was already determined that Kelley was "not qualified to RTW" and she had already told him. (Id. at ¶ 16).

Messina confirmed that she kept Kelley off work after Concentra released him (on July 13, 2018). (Id. at ¶ 20). She did so, she said, because he was a Type 1 diabetic who worked in a "safety sensitive position." (Id.) Messina held the belief that "a Type 1 diabetic" could not hold a "safety sensitive" position at the CTA. (Id.) Hampton also believed this. (Id.)

Kelley subsequently left several messages for Maddox (leave management). (Id. at ¶ 19). Hearing nothing back, Kelley contacted his union. (Id. at ¶ 21). He did this because he had to go through his union rep. (Id.) His union filed a grievance July 23, 2018. (Id.) The grievance alleged that the CTA had constructively disciplined or suspended Kelley "indefinitely, without the ability to return to work." (Id.) It noted that Kelley had "several medical releases/reports verifying that he is medically clear to return to work full duty." (Id.) It even attached those releases. (Id.) It even said

4

what the CTA was doing was a violation of the Americans with Disabilities Act. (Id.) It demanded that Kelley be immediately reinstated. (Id.)

The CTA did not respond to this grievance by telling Kelley or his union that there was something he could do to return to work, such as see a medical specialist (as they now falsely claim in their summary judgment submissions)—whatever they would have asked Kelley to do, he would have done. (Id. at ¶ 39). Instead, in response to getting this grievance, Maddox asked Carla Lowe to send her a new form which her assistant did on July 27, 2018 which now said, "not cleared to RTW 7.16.18 CL." (Id. at ¶ 22). No one gave this to Kelley. Perhaps more importantly, this document did not indicate that there was something Kelley needed to do (or could do) to get "cleared." It simply said "not cleared to RTW." (Id.) On July 30, 2018, Maddox drafted a letter that said "Mr. Kelley is not medically fit to RTW." (Id. at ¶ 23). This letter was not sent to anyone, it seems, but, again, it did not say Kelley needed further medical review, or that the CTA was waiting on him to do something. It said "not medically fit to RTW." (Id. at ¶ 23). This is, of course, despite the fact that no medical provider had found that he was "not medically fit." (Id. at ¶ 26).

On August 8, 2018, the union requested a "sit down meeting" with CTA attorneys Katharine Lunde and Brad Jansen, deputy chief of the labor division of the law department. (Id. at ¶ 24). They did not respond. (Id.) On August 15, 2018, Kelley reached out to the EEOC. (Id. at ¶ 25). In his communication, he wrote that the CTA's reason for keeping him off work was "that I have diabetes & this disability is not allowed in a safety sensitive position." (Id.)

On August 16, 2018, the CTA's labor representative made clear: "Mr. Kelley is still off work because he does not meet the requirements of his safety-sensitive position (because of his diabetes." (Id. at ¶ 26). She did not write "Kelley is still off work because he needs to go see a specialist to get further clearance and we told him that" (the concocted story the CTA now submits to this Court). (Id.) On August 22, 2018, Hampton reiterated the CTA's view: "Lionel Kelley was found unfit by

5

Concentra due the nature of his condition in a safety sensitive position." (Id.) Again, she reiterated the falsehood that *Concentra* had found Kelley unfit. (Id.). Messina, for her part, made the CTA's position clear, on August 22, 2018 when trying to deny Kelley unemployment benefits, writing that Kelley "was found unfit for his job duties." (Id.) Again, a falsehood. (Id.) Again, the passive voice about a decision she had made. (Id.)

There can be no denying that everyone involved knew Kelley wanted to return to work. (Id. at ¶ 27). However, no one, not one person ever, told Kelley there was anything he needed to do (or could do) to return to work. (Id. at ¶ 28). His supervisor, Messina, never did. (Id.) Leave management, Maddox, never did. (Id.) If either of them wanted Kelley to return to work, they would have, presumably, followed CTA policy, which said that an employee who is "found unfit" will be provided a form stating that (they have been found unfit), will be instructed to report to his medical provider to address the reason for the unfit status, and will be scheduled for a follow up appointment with Concentra. (Id. at ¶ 29). This policy was not followed. (Id. at ¶ 28). The logical inference is <u>that the CTA did not want him to return.</u>

Kelley was off work, unpaid, for over a year. (Id. at ¶ 31). On August 14, 2019, a labor arbitrator, after two hearing, issued a written opinion that ordered the CTA to give Kelley "a full and fair opportunity to medically qualify to return to his position as a substation B maintenance electrician… The CTA must provide the Grievant with complete information about how he can medically qualify to return to his safety-sensitive situation." (Id.) The CTA did not react to this order with any statements of outrage, such as, "we already did that!" Of course not, because they never had. And the arbitrator's order would not have made any sense if they had.

Still, the battle raged on. On August 19, August 30, and September 11, 2019, the union reached out in writing to the CTA to ask for instructions on how Kelley could "medically qualify" and return to work. (Id. at ¶ 33). Clearly, no instructions had *ever* been given.

6

Finally, on September 13, 2019, Maddox made Kelley an appointment at Concentra. (Id. at ¶ 34). That day, Kelley reported as instructed and saw a Dr. Kang. (Id.) Dr. Kang found him fit to return. (Id.) The CTA was surprised and unhappy; Maddox wrote to several people, "Ms. Carla Lowe at Concentra is taking a closer look into how he was found fit." (Id.) But the CTA could not (or chose not to) repeat what they had done in July 2018. Kelley reported back to work October 3, 2019.

Kelley has worked for the CTA for nearly four years since returning without having another low blood sugar episode. (Id. at ¶ 36). Kelley has never called off work due to symptoms from diabetes. (Id.) He has never hurt himself at work; and he has never hurt anyone else. (Id.) Kelley has always worked with a partner. (Id.)

<u>Summary Judgment Standard</u>

Summary judgment is appropriate only where the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). The nonmoving party must establish "that a reasonable jury could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie… if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). In deciding a motion for summary judgment, a "court …must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *McCottrell v. White*, 933 F.3d 651, 657–58 (7th Cir. 2019);

*see also Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Argument

In a disability discrimination case, the sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept his job if he were not disabled. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). *Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686–87 (N.D. Ill. 2017) (applying *Ortiz* to ADA claims). Put another way, a plaintiff is entitled to a jury trial if the evidence would permit a reasonable factfinder to conclude that the plaintiff's disability caused his employer to take the adverse employment action they did. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

In the instant case, a reasonable jury could find that Kelley's condition of having Type 1 diabetes caused the CTA to keep him off work for 15 months. Indeed, the CTA admits as much. Really, the thrust of the CTA's arguments are that Kelley was a "direct threat," which is an affirmative defense that CTA did not even plead in its Answer (CM/ECF Doc. 25) and for which it lacks any evidentiary support.

**I. The CTA refused to let Kelley work for 15 months because he has Type 1 diabetes.**

As detailed in Plaintiff's Rule 56.1 statement and *supra*, Messina kept Kelley from working for 15 months[2] because, in her view, he could not work for the CTA in a "safety sensitive job" as a "Type 1 diabetic." On this point, the CTA admits to disputes *among its own witnesses:* "While there is testimony from just two CTA employees that CTA's policy was that insulin-dependent diabetics could not work in a safety-sensitive position, this was not the case and the overwhelming evidence,

---

[2] Plaintiff does not sue for being off work July 2-13, 2018, but for being off work July 13, 2018-October 3, 2019. As he testified, the CTA discriminated against him when he was "not reinstated by the CTA after passing the medical. And not given the reasonable information to retain employment or get my employment reinstated." (SOF at ¶ 38).

8

including that Plaintiff was hired while taking insulin, shows this." (Def. Memo at p. 14) What overwhelming evidence is the CTA referring to here? None has been cited. That Kelley "was hired while taking insulin" is of no import. What matters is what Messina knew at the time she rejected Kelley's return-to-work clearance from Concentra and instructed that he be "carried as sick on the timesheets." (SOF at ¶ 15). She testified she did not know Kelley had diabetes until her meeting with him on July 2, 2018. (SOF at ¶ 5). She has made very clear that she believed Kelley could not work at the CTA due to his Type 1 diabetes. (SOF ¶ 20). This statement was made by her over and over again. (SOF ¶ 6, 20, 26, 35). And when she discovered that he had diabetes, she prevented him from working.

      Every case cited by the CTA in support of the idea that Kelley was kept off work because of his own "failure to control his illness" involved an employee who was terminated for committing a dangerous (or otherwise "bad" act) who tried to use their disability as an excuse for the behavior. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1310 (10th Cir. 2017) (employer "honestly believed that [customer service rep] dropped the customer calls intentionally."); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 665 (7th Cir. 1995) (police officer "erratically drove his squad car at high speed through residential areas some forty miles outside his jurisdiction. He stopped only when pulled over by police officers from St. Charles and Batavia."); *Johnson v. Am. Signature, Inc.*, 31 F. Supp. 3d 980, 981 (N.D. Ill. 2014) (employee was terminated for urinating into a cup in front of a co-worker); and *Wenrich v. Empowered Mgmt. Sols. LLC*, No. 17-CV-00639-MSK-KMT, 2019 WL 3550835, at *1 (D. Colo. Aug. 3, 2019) (doctor did not respond when paged to a patient; and a month later was unable to perform an emergency c-section).

      Here, Kelley was accused of no misconduct or dangerous behavior whatsoever. He was simply found "dazed" and "alert but disoriented" at work, while working at a desk. The CTA seems to be arguing that Kelley having diabetes was (as a general matter) dangerous, in a "safety sensitive"

environment—although Kelley currently works for them and has (since coming back in October 2019) for almost 4 years.³ Plaintiff turns to these issues of "safety" and "threat" now.

**II. The CTA cannot prove that Kelley was a "direct threat."**

To escape liability for taking action against a disabled employee because of his disability, it is the <u>employer</u> who bears the burden of proving that it took the action because the employee was a "direct threat" to workplace safety. *Pontinen v. United States Steel Corp.*, 26 F.4th 401, 406 (7th Cir. 2022); *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004) ("it is the employer's burden to show that an employee posed a direct threat to workplace safety that could not be eliminated by a reasonable accommodation."). The determination that an employee poses a direct threat to his own health and safety or that of others must be premised upon "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005) (employer told employee it was rescinding his offer because he had not passed the physical performed by a doctor).

What such evidence has the CTA submitted? None. The CTA failed to even disclose an expert to rebut Plaintiff's expert, Dr. David Fletcher (who will testify that Kelley's diabetes was well controlled and that he was safe to work). Perhaps this is why they have moved to bar him. (CM/ECF Doc. 59).

Here, the CTA relied on no "reasonable medical judgment" in keeping Kelley off work for 15 months. The people that caused it (Jeannine Messina, Georgette Hampton, and Deshone Maddox, with the help of Carla Lowe,) have no medical degrees, background, or training. The CTA has cited to no "objective evidence," let alone the "best available" objective evidence. In the 3 individualized assessments done (Dr. Kang on July 5, 2018; Dr. Venetos on July 6, 2018 and after;

---

³ Surely this is not actually the CTA's position?

10

and Dr. Patino on July 13, 2018), not one of them determined that Kelley could not safely perform his job. Kang posed the question to Kelley's PCP, who answered that he could do the job; and Patino released Kelley. Concentra cleared him. Thereafter, neither Concentra nor the CTA informed Kelley of anything. They certainly did not inform him that he "had not passed a physical." Simply put, no physician has *ever* found Kelley unfit to perform his duties.

Despite the clearances from Dr. Venetos and Dr. Patino, Messina determined *on her own* that she was not recognizing the RTW note, because those with Type 1 diabetes are to be excluded from entire classes of jobs at the CTA. She admitted that this was based on general knowledge from a prior position and nothing else (and certainly not on medical advice). (SOF ¶ 20, 35).

The CTA focuses on the actual day where he experienced a blood sugar issue. Plaintiff makes no argument that he was discriminated against on this day. He does not argue that he was discriminated against when Messina sent him for a fitness-for-duty evaluation. Rather, he argues that he was discriminated against when he was *kept off work for 15 months* after Messina discovered that he had diabetes and after three medical providers subsequently cleared him to return to work. (SOF ¶ 38).

Kelley worked for the CTA for over 3 years before his hypoglycemic (low blood sugar) diabetic incident on June 28, 2018. He has now safely worked for the CTA, since being reinstated, for almost 4 years. CTA simply cannot prove that he was a "direct threat." They certainly are not entitled to summary judgment on this affirmative defense.

**III. A "safety sensitive" work environment is a red herring.**

The CTA uses this phrase twenty-five (25) times in its Statement of Facts and fourteen (14) times in its memorandum of law. The CTA has always used the phrase as justification for their actions (See SOF at 5, 14, 20, 25, 26, 33, and 35), but what does it mean? The CTA's Vice President of Human Resources testified an employee who is designated "safety sensitive" is one who is eligible

for random drug and alcohol testing. (Moreno Dep. 6:18; 16:9-24). This, obviously, has no bearing on this case. Plaintiff asked the CTA in discovery to produce any documents explaining what the phrase means, and the CTA answered by referring to documents about the CTA's drug and alcohol testing program. (Id. at ¶ 37). None of the people involved in keeping Kelley off work (Messina, Hampton, and Maddox) could define what is meant by the phrase. (SOF ¶ 20).

The CTA has cited to nothing (factual or legal) that makes this "safety sensitive" designation relevant to the facts of this case. The CTA classifies approximately 73.5% of its workforce as "safety sensitive." (Id. at 37). Unless it is claiming that it can treat 73.5% of its workforce however it wants by writing the word "safety sensitive," Plaintiff submits that this "designation" must be seen for what it is in this case—pretext for discrimination.

**IV. Kelley does not need to show "pretext."**

It is not true that CTA has "articulated non-discriminatory reasons for its actions." Rather, its position is that Kelley was kept out of work for 15 months because he had a diabetic episode while at work and that Messina, upon discovering that he had diabetes, kept him off work and directed that he be 'carried as sick on the timesheets." These are not non-discriminatory reasons for its actions. These are *discriminatory* reasons (i.e., because of Kelley's diabetes) for its actions. The CTA now asserts this motivation (which was never articulated in 2018 or 2019): "CTA's actions were predicated on the goal of protecting Plaintiff, his coworkers, and the public from harm until he could establish through a specialist that he was safe to return." No citation is provided for the statement. This statement of "fact" must be disregarded, and the CTA should be sanctioned for offering this baseless, disputed "fact" as evidence to this Court. Plus, even if this were a burden-shifting case, the employer's proffered nondiscriminatory reason must be *legitimate*. *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023). Making assumptions and forming personal opinions about whether an employee is medically safe to return to work—without relying on

12

legitimate medical advice—is obviously illegitimate. Indeed, employment decisions are not to be based on "generalizations associated with the individual's disability rather than on the individual's actual characteristics.'" *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 573 (7th Cir. 2001) (quoting *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir.2000)).

**V. No evidence of a "comparator" is required.**

Kelley does not need to rely on any "burden-shifting framework" because he has Messina's own testimony about her discriminatory beliefs. He does not have to identify any "comparator." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–58 (7th Cir. 2021) ("a plaintiff need not use the *McDonell Douglas* framework after *Ortiz*. At summary judgment, [w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor.")(internal citations omitted).

**VI. The CTA cites a disputed (indeed, baseless) version of events.**

The CTA argues that Kelley was kept off work for 15 months because of his own failure to act, writing that there is "both documentary evidence and deposition testimony that CTA's agent, Concentra, provided [how to safely return to work] to Plaintiff." (Def Memo at p. 12). This statement lacks any evidentiary support whatsoever. No one, not one person ever, told Kelley there was anything he needed to do (or could do) to return to work. (SOF at ¶ 28). There is nothing in the record showing that Concentra told Kelley how to return to work, nor is there any deposition testimony that this occurred. The CTA's *own witness*, Maddox, acknowledged that Lionel Kelley had a "non-injury work status report" from July 13th, 2018 where he was told that he could return to work without restrictions as of 7/13/18 and that, after that, he "he never received one that said anything different." (Id.).

The CTA specifically argues that Kelley's loss of income was caused by his "failure to receive clearance from an endocrinologist as required." (Def. Memo at page 2, lines 8-9). But at no time was

13

this "requirement" conveyed to Lionel Kelley, by Concentra, CTA or anyone else. (SOF 28). Even the CTA's own statement of facts does not provide factual support for this assertion. (Pl's Response at #74). And it did not happen. (SOF 28, 39).

These statements of "fact" must be disregarded, and the CTA should be sanctioned for offering these baseless, disputed "facts" as evidence to this Court.

## Conclusion

This case has been pending for 3 years and is set for trial in February 2024. The CTA is clearly not entitled to summary judgment under FRCP 56. Several "facts" presented by the CTA lack *any* evidentiary support. Countless others are disputed by Plaintiff, as shown by clear citations to the record. The CTA is not entitled to judgment as a matter of law, because, viewing the facts in a light most favorable to Lionel Kelley, a jury could (easily) find that the CTA discriminated against him for having Type 1 diabetes. Plaintiff requests that the motion be denied.

Submitted by:

/s/ Julie Herrera
Law Office of Julie O. Herrera
159 N. Sangamon St., Ste. 200
Chicago, IL 60607
312-479-3014 (Phone)
708-843-5802 (Fax)
jherrera@julieherreralaw.com

Dated: 6/7/23