**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LIONEL KELLEY,

Plaintiff,

v.

CHICAGO TRANSIT AUTHORITY,

Defendant.

Case No. 20-CV-02881

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Lionel Kelley ("Kelley") claims that his employer, Defendant Chicago Transit Authority ("CTA"), discriminated against him on the basis of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-101 *et seq.* The CTA has moved for summary judgment on all of Kelley's claims. [61]. For the reasons explained below, this Court denies the CTA's motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts

1

are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

2

<h1 style="text-align:center">BACKGROUND[1]</h1>

The following facts are undisputed unless otherwise noted.[2]

## I. Kelley's Employment with the CTA

Kelley was hired by the CTA as a substation attendant in April of 2015. [64] ¶ 2. Within a year, Kelley transitioned into the job of B Electrician (also known as substation maintenance) and is responsible for maintaining the rail equipment that supplies electricity to CTA's rails and tracks. *Id.* ¶ 4. Since then, Kelley has been employed as a B Electrician and is also a member of the International Brotherhood of Electrical Workers, Local 134 ("Union"). *Id.* ¶ 2.

## II. Kelley's Incident on June 28, 2018

Kelley is a type 1 diabetic, which requires him to inject insulin and monitor his food intake and physical activity. *Id.* ¶ 19. Since 2017, Kelley has been monitoring his sugar level via a skin patch called Dexcom, and Dexcom notifies him through an app installed on his phone if his sugar level is low or high. *Id.* ¶ 22. Kelley receives a three-month supply of Dexcom from his medical supplier upon his doctor issuing a prescription to the medication provider. *Id.*

---

[1] This Court takes these facts from the CTA's Statement of Facts [64], Kelley's Response to the CTA's Statement of Facts [69], Kelley's Statement of Additional Facts ("SOAF") [70], the CTA's Response to Kelley's SOAF [79], and various exhibits and declarations the parties have submitted in connection with the CTA's motion for summary judgment.

[2] The CTA points out that Kelley's response and his Local Rule 56.1 statement do not comply with the requirements of the rule, and it contends, among other things, that the Court should treat all improperly controverted factual statements as admitted. [80] at 3–6. Where appropriate, the Court notes what evidence it relies upon in making its decision and ignores evidence that does not comport with the requirements of the Local Rules.

On June 28, 2018, Kelley was scheduled to install light fixtures with Julio Hernandez in the CTA's Loomis substation. *Id.* ¶ 37. Kelley was not wearing a Dexcom patch because the last patch fell off in the shower the day before. *Id.* ¶ 35. Despite being able to request an overnight delivery for a replacement patch, Kelley admitted that he did not do so because the next regularly-scheduled supplies were already in process to be delivered—although that would not be until approximately three days after his patch fell off. *Id.* ¶ 35. Without the Dexcom patch, Kelley was testing his sugar level on test strips that day. *Id.* ¶ 37.

After the light fixtures were installed, Hernandez left the Loomis substation and Kelley was documenting the work he performed that day alone. *Id.* ¶ 38. That was the last thing Kelley remembers before he was woken up by paramedics after passing out due to a low blood sugar level. *Id.* When Kelley did not call a Power Controller from Loomis substation at the end of his shift, a Power Controller sent out another employee to check on Kelley. *Id.* ¶ 39. That employee found Kelley on the ground in the Loomis substation and informed the Power Controller that he needed an ambulance. *Id.* After the paramedics arrived, Kelley ate a meal to increase his sugar level, refused to go to a hospital, and drove home. *Id.* Kelley admitted that he passed out and said, it was "my fault", I "[did not] do [what] I was supposed to [do]" with my food intake and insulin, and I "just [do not have] any excuse for it." *Id.* ¶ 40. Kelley testified that he did not consume the right amount of food that day and that he took too much insulin. *Id.* Kelley also admitted that he probably did not do enough

testing of his blood sugar level via test strips because he only did it three times that day, and he normally checks his sugar manually six or seven times per day. *Id.*

### III. CTA Response and Kelley's Medical Examinations

On July 2, 2018, Kelley returned to work at Loomis station but was informed that he needed to see his supervisor Jeannine Messina. *Id.* ¶ 43; [70] ¶ 5. Kelley met with Messina and his Union representative, Robert Casto, at Messina's office where they discussed the June 28, 2018 incident. [64] ¶ 43. Messina testified that she became aware for the first time that Kelley was diabetic at that meeting. [70] ¶ 5. Messina informed Kelley that he was being removed from service and that he would be contacted by CTA's Leave Management unit ("Leave Management") to pursue getting a fit-for-duty evaluation from Concentra, the CTA's third-party medical service provider. [64] ¶ 44.

On July 5, 2018, Kelley reported to Concentra and saw Dr. David Kang. *Id.* ¶ 50. According to Kelley, after Dr. Kang learned that Kelley was diabetic, he informed Kelley that he would not be medically cleared to return to work until he obtained a note from his doctor stating that he is in good condition to return to work. *Id.* Dr. Kang testified that he told Kelley to get a letter from his Primary Care Physician ("PCP"). [70] ¶ 8. Later that day, Kelley called his PCP, Dr. John Venetos, told him about the incident, and informed Dr. Venetos that he needed a note stating that he was in good condition to return to work. [64] ¶¶ 24, 53. On July 6, 2018, Dr. Venetos

5

drafted, signed, and faxed back Dr. Kang's form to Concentra with a note that stated "pt [patient] clear to return to work." *Id.* ¶¶ 55–56; [73], Pl.'s Ex. 19.[3]

On July 9, 2018, Kelley's supervisor Messina emailed Deshone Maddox, a CTA employee in Leave Management, that Kelley had called her about the clearance, but Messina believed Kelley had to bring the paperwork to Concentra and receive a final determination from a doctor there. [64] ¶ 30; [70] ¶ 9; [74], Pl.'s Ex. 21 at 2. Maddox responded that "we" asked Concentra to tell Kelley to report back to Concentra to "complete the exam" and said she would instruct Kelley to report back to Concentra. [70] ¶ 9; [74], Pl.'s Ex. 21 at 1–2.

On July 13, 2018, Kelley returned to Concentra and saw Dr. Nicole Patino who took his sugar and gave him a physical. [70] ¶ 10; Pl.'s Ex. 24. Afterwards, Concentra staff gave Kelley a note that stated, "Result Status: No medical restrictions" and "Remarks: may RTW [return to work] without restrictions as of 7/13/18." [70] ¶ 10; [74], Pl.'s Ex. 23. Concentra's records show Dr. Patino's signature on a document with "Service Date: 07/13/18" that has an "X" by "Job description was provided by the employer and has been reviewed by the examining provider" and says the "Fit for Duty Examination Results" are that Kelley "[m]ay work without limitations/restrictions." [70] ¶ 10; [74], Pl.'s Ex. 24; *see also* [74], Pl.'s Ex. 25 (job description given to Concentra). That day, Messina received a call from Julio Hernandez, Kelley's immediate foreman, "who notified [Messina] that Kelley was

---

[3] Dr. Venetos's clearance on July 6, 2018 indicated that Kelley "has not had any hypoglycemic episodes in the last three months" even though Kelley had such an episode on June 28, 2018. [73], Pl.'s Ex. 19.

cleared to return to work per CTA's doctor." [70] ¶ 12. An employee in Leave Management emailed Georgette Hampton, who oversees Leave Management, and Messina the following in response to emails from them: "I spoke to Mr. Kelley and he was advised not to report to work, and to expect a follow up call from Leave Management on Monday." [64] ¶ 30; [70] ¶ 12; [74], Pl.'s Ex. 27.

On July 16, 2018, at 10:15 a.m., Maddox emailed Carla Lowe, an operations director at Concentra, and stated, "Mr. Kell[e]y works in a safety sensitive position and is insulin dependent. Can you call me about this case?" [70] ¶ 14; [74], Pl.'s Ex. 28; [74], Pl.'s Ex. 29 at 13:5–7. Less than an hour later at 11:09 a.m., Messina wrote an email to her boss, William Mooney, and five other people that stated: "Please be advised Mr. Kelley has been found unfit to return to work and should be carried as sick on the time sheets. If you should have any questions, please let me know." [70] ¶ 15; [72-1], Pl.'s Ex. 8. Less than 30 minutes later, Lowe emailed Dr. Patino: "Can you please update [Kelley's] physical to reflect he is not qualified to RTW? I have already reached out to the patient to inform him of the updated status." [70] ¶ 16; [74], Pl.'s Ex. 30 at 2.

## IV. Kelley's Grievance and Return

On July 23, 2018, Kelley's Union filed a grievance alleging that "the [CTA] has constructively disciplined and/or suspended [Kelley] indefinitely, without the ability to return to work, despite several medical releases/reports verifying that he is medically clear to return to work full duty with no restrictions." [70] ¶ 21; [75], Pl.'s Ex. 32. A couple days later, the grievance was shared with Messina and her boss

Mooney. [70] ¶ 22; [75], Pl.'s Ex. 33. Two days later, on July 27, 2018, Concentra's assistant operations director, Joselyn Perez, emailed Maddox stating, "Here you go Deshone [Maddox], let me know if there is anything else I can assist you with," and attached a document stating Kelley was "not cleared to RTW [return to work] 7.16.18 CL." [70] ¶ 22; [75], Pl.'s Ex. 34. Lowe, an operations director at Concentra, testified that she entered that comment in the document. [70] ¶ 22. Messina testified that she did not give the document to Kelley. [72-1], Pl.'s Ex. 7 at 52:20–53:3. Maddox acknowledged that this document contained no information that there was something Kelley needed to do to get back to work. [70] ¶ 22.

On July 30, 2018, a week after the grievance, Maddox circulated a letter signed by Hampton to Messina and others that stated:

> On 7/13/18, our Third Party medical Service Provider released Mr. Kelly to RTW full duty. However, upon further review of Mr. Kelley's current medical condition, our Third Party Medical Service Provider determined that Mr. Kelley could not perform the essential functions of his job safely. Therefore, Mr. Kelley is not medically fit to RTW[.]

[70] ¶ 23; [75], Pl.'s Ex. 35. The letter was addressed to Bob Castro, Kelley's Union representative, and Kelley asserts there is no evidence the letter was sent to Castro (or anyone else). [70] ¶ 23. On August 14, 2018, Casto wrote a letter to the CTA's legal department stating that the CTA had "suspended [Kelley] indefinitely, without the ability to return to work, despite several medical releases/reports verifying that he is medically clear to return to work full duty with no restrictions." [70] ¶ 24; [75], Pl.'s Ex. 37. Kelley's EEOC intake form is dated August 15, 2018, and claims, among other things, that the CTA's reason for keeping him off work was "that [he] ha[s] [d]iabetes

8

& this disability is not allowed in a [s]afety [s]ensitive [p]osition." [70] ¶ 25; [75], Pl.'s Ex. 38.

On August 16, 2018, the CTA's labor representative wrote to Castro that "Kelley is still off work because he does not meet the requirements of his safety-sensitive position (because of his diabetes)." [70] ¶ 26; [75], Pl.'s Ex. 40. On August 22, 2018, Hampton, who oversees Leave Management, reiterated the CTA's view: "Kelley was found unfit by Concentra due the nature of his condition in a safety sensitive position" and was "out on STD [short-term disability]." [70] ¶ 26; [75], Pl.'s Ex. 41. That same day, Messina wrote to the CTA's unemployment coordinator that Kelley "was found unfit for his job duties." [70] ¶ 26; [75], Pl.'s Ex. 42.

About a year later, on August 14, 2019, a labor arbitrator issued a written opinion that ordered the CTA to give Kelley "a full and fair opportunity to medically qualify to return to his position as a substation B maintenance electrician," and stated that "[t]he CTA must provide the Grievant with complete information about how he can medically qualify to return to his safety-sensitive situation." [70] ¶ 31; [76], Pl.'s Ex. 46 at 38. The Union reached out three times to the CTA over the following four weeks to ask for instructions on how Kelley could "medically qualify" and return to work. [70] ¶ 33; [76], Pl.'s Ex. 47 (8/19/2019 email and letter), Pl.'s Ex. 48 (8/30/2019 email), Pl.'s Ex. 49 (9/11/2019 email). Afterwards, Maddox instructed Kelley to go to Concentra on September 13, 2019. [70] ¶ 34; [72-1], Pl.'s Ex. 6 at 71:4–13. Kelley reported as instructed and was found fit to return to work. [70] ¶ 34; [76], Pl.'s Ex. 50. Later that day, Maddox emailed Messina and others that "Ms. Carla

9

Lowe at Concentra is taking a closer look into how [Kelley] was found fit." [76], Pl.'s Ex. 50. Kelley returned to work on October 3, 2019. [64] ¶ 80.

## ANALYSIS

Kelley alleges that the CTA took an adverse employment action against him because of his disability in violation of the ADA, the Rehabilitation Act, and the IHRA. The parties agree that these claims are governed by the same standards.[4] [63] at 2–3; [68] at 8; *see also Vargas v. DeJoy*, 980 F.3d 1184, 1190 n.4 (7th Cir. 2020) (courts "resolve Rehabilitation Act claims by looking to the same standards and provisions that govern the [ADA]"); *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019) ("Illinois courts have looked to the standards applicable to analogous federal claims when evaluating IHRA claims, so we consolidate our analysis of both counts"). Thus, the Court analyzes all three claims together for the purposes of summary judgment, and Kelley may defeat summary judgment by relying on two frameworks to show discrimination.

First, Kelley may proceed under the burden-shifting framework the Supreme Court developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Under *McDonnell Douglas*, a plaintiff must establish a prima facie case by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of

---

[4] The Rehabilitation Act also requires Kelley to show that the CTA "received federal financial help." *Thurmon v. Mount Carmel High School*, 191 F. Supp. 3d 894, 898 (N.D. Ill. 2016) (cleaned up). The CTA does not raise this issue in its motion or argue that it is not federally funded. [63] at 3.

his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to present a "legitimate, non-discriminatory reason" for the decision. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021) (quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)). If the employer presents a legitimate, non-discriminatory reason, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

Alternatively, Kelley may rely on the framework articulated by the Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Under *Ortiz*, this Court's inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that [Kelley's] … [disability] caused the … adverse employment action." 834 F.3d at 765. Here, Kelley proceeds under the *Ortiz* framework, not the *McDonnell Douglas* framework.[5] [68] at 8. In making this determination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. Thus, this Court asks whether a reasonable juror could conclude that Kelley

---

[5] The CTA frames many of its arguments under the *McDonald Douglas* framework: (1) Kelley was not meeting the CTA's legitimate expectations, (2) Kelley failed to identify any similarly situated non-disabled employees who were treated more favorably, and (3) Kelley failed to establish pretext. [63] at 6–8, 13–15; [80] at 8–11, 13. However, Kelley is not required to utilize the *McDonald Douglas* framework and relies on the *Ortiz* framework. *See Igasaki*, 988 F.3d 948 at 957–58 ("a plaintiff need not use the *McDonell Douglas* framework after *Ortiz*."). Ultimately, the issue at summary judgment is whether Kelley "presented enough evidence to allow the jury to find in [his] favor." *Id.* (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020).

would have kept his job if he did not have a disability, and "everything else had remained the same." *Id.* at 766.

Kelley's discrimination claims arise from a nearly fifteen-month period where the CTA did not reinstate him after he was cleared to return to work. [68] at 8, 8 n.2. The Court finds that Kelley has put forth evidence to support a reasonable inference that the CTA discriminated against him.

First, the CTA acknowledges there are disputed facts regarding CTA's policy as applied to Kelley, a person with diabetes serving as a B Electrician: "While there is testimony from just two CTA employees that CTA's policy was that insulin-dependent diabetics could not work in a safety-sensitive position, this was not the case and the overwhelming evidence, including that Plaintiff was hired while taking insulin, shows this." [63] at 14. Kelley's *supervisor*, Jeannine Messina, learned that Kelley had diabetes for the first time after the incident. [64] ¶ 44. Messina testified that she believed that "type 1 diabetics were not allowed to be in safety-sensitive positions at the CTA." [72-1], Pl.'s Ex. 7 at 17:9–12. The CTA notes that Messina was informed that there was exemption for type 1 diabetics in a safety sensitive position, but Messina could not recall when she received this information. *Id.* at 18:3–19:4. Additionally, Georgette Hampton, who *oversaw CTA's Leave Management*, also believed (at least before August 2019) that "CTA policy was that people who used insulin were not allowed to work in safety sensitive positions." [70] ¶ 20; [72-1], Pl.'s Ex. 9 at 62:2–7. Neither Messina nor Hampton could define "safety sensitive" or say where the phrase comes from. [70] ¶ 20.

Second, it is undisputed that Kelley was cleared to return to work on July 13, 2018. [70] ¶ 10. Three days later, Maddox, another CTA employee in Leave Management, emailed Carla Lowe, an operations director at Concentra, and stated, "Mr. Kell[e]y works in a safety sensitive position and is insulin dependent. Can you call me about this case?" [70] ¶ 14; [74], Pl.'s Ex. 28; [74], Pl.'s Ex. 29 at 13:5–7. Less than an hour later, Messina wrote an email to her boss and five other people that stated: "All, please be advised Mr. Kelley has been found unfit to return to work and should be carried as sick on the time sheets. If you should have any questions, please let me know." [70] ¶ 15; [72-1], Pl.'s Ex. 8. Less than 30 minutes after that, Lowe emailed Dr. Patino: "Can you please update [Kelley's] physical to reflect he is not qualified to RTW? I have already reached out to the patient to inform him of the updated status." [70] ¶ 16; [74], Pl.'s Ex. 30 at 2. Additionally, on July 30, 2018, Maddox sent a letter from Hampton to Messina and others stating that a medical service provider released Kelley to return to work but "upon further review" that provider "determined that Mr. Kelley could not perform the essential functions of his job safely." [70] ¶ 23; [75], Pl.'s Ex. 35.

The CTA argues that Kelley "present[ed] a direct threat to [his] own health and safety or that of others." [63] at 7 (quoting *Kirincich v. Illinois State Police*, 196 F. Supp. 3d 845, 850 (N.D. Ill. 2016)). "In order to prevail on its summary judgment motion asserting that [Kelley] posed a direct threat to himself and others, [the CTA] must show that the evidence on the question of direct threat is so one-sided no reasonable jury could find for [Kelley]." *Pontinen v. United States Steel Corp.*, 26

F.4th 401, 408 (7th Cir. 2022). The determination that an employee poses a direct threat to his own health and safety or that of others must be premised upon "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005). As discussed, Kelley has presented evidence that *the CTA* determined that Kelley could not return to work. At the same time, it is undisputed that Dr. Venetos and Dr. Kang cleared Kelley based on incorrect information that Kelley "ha[d] not had any hypoglycemic episodes in the past three months." [64] ¶¶ 53, 56. Further, Kelley acknowledges that he never told Dr. Patino he was in a "safety-sensitive" position, but the parties dispute the importance of the designation and its impact on the fit-for-duty evaluation.  [69] ¶ 58. Nevertheless, the CTA has not presented evidence of a "direct threat [that] is so one-sided no reasonable jury could find for [Kelley]." *Pontinen*, 26 F.4th at 408.

In sum, Kelley has raised a triable issue of fact on whether the CTA's failure to reinstate him was discriminatory.

## CONCLUSION

For the reasons explained above, this Court denies the CTA's motion for summary judgment [61]. This Court notes that Kelley requests sanctions because he believes some of the facts offered by the CTA's are unsupported or disputed. [68] at

12–14. This Court does not find sanctions appropriate, and thus, denies Kelley's request.

E N T E R :

Dated: January 2, 2024

_____

MARY M. ROWLAND
United States District Judge